And we'll give Council an opportunity to get to the tables and make themselves comfortable. Thank you. Thank you. Thank you. Thank you. Thank you.  We'll hear first from Miss DeSalvo. May it please the court. My name is Claudia DeSalvo and I'm a certified legal intern with the NSU Disability Inclusion and Advocacy Law Clinic on behalf of the appellant, Mr. Dylan Campbell. Today I will be sharing my time with Mr. Brent Levine from the Department of Justice. Your honors, this is a case under the ADA where Universal, a place of public accommodation, discriminated against Mr. Campbell for his physical disability of being born without his right forearm in hand. They did so by implementing baseless and arbitrary eligibility criteria that prevented individuals with limb differences from riding water slides. These eligibility criteria assumed the correlation between riding position and limb differences without any of their assessments finding a correlation or an actual risk for these. I would like to state that the parties have agreed to the facts in this case, which includes the three risk analyses conducted by both ProSlide, the foreign manufacturer, and Universal. None of these risk analyses showed any significant harm to individuals with limb differences. The lower court erred in its assessment on whether or not the ADA applied. There is no... Let's say we agreed with you that the lower court's sort of reverse preemption analysis was wrong. The regulation says that something is necessary as a safety matter if it's a legitimate safety requirement based on actual risk. Where do you get the idea that there needs to be sort of studies and evidence and things like that to prove that? Your Honor, the Supreme Court held in Chevron v. Edges of Ball that when assessing a risk, that the assessment of this risk must be based off of reasonable judgment that relies on current medical evidence. Well, I guess here we're talking about a slide that has a significant drop, and there are two handles, and the disabled person can't hold one handle. And I guess maybe that's a close case. I don't know. But it seems like certainly there would be some kinds of amusement park rides where you could just say, look, I'm sorry, but it would be unsafe for you to ride on this ride. One of the things that kind of generated, I think, this issue for a lot of people was this horrible accident where a guy who had fought in, I think it was Iraq, and had no legs tried to ride a roller coaster and was ejected from the roller coaster and died. You know, why would we not, why would we tell the amusement park operator, yeah, even though he has no legs and can't, you know, the seatbelt won't fit over him, you have to let him on because you didn't do any studies on that. Your Honor, things like restraints have been extensively assessed, and they have a legitimate medical basis behind them as to whether or not an individual can properly be fastened by these restraints. When it comes to whether or not he can hold on to the handles, ProSlide did conduct several risk analyses to determine whether or not there was a risk or harm when an individual does not hold on. And oftentimes this risk was shown to be something minor such as a bruise, a laceration, or hurting their fingers from not holding on. As far as not maintaining riding position, something like whiplash or possibly a sprain would occur, which again are minimal risks that any individual who rides these rides would be taking on. In addition, ProSlide... How do we figure out though, I guess, and like I've kind of skipped ahead on a lot of this, but I mean, how do we figure out what the appropriate amount of risk is for someone to... That's just something I'm struggling with. The ASTM has left a lot of discretion to the manufacturers as they are the people in the best position to make these determinations. And they have extensive guidelines in which they categorize the risks, and they do very comprehensive analyses of... Yeah, but I'm saying as a matter of law, like, I mean, you say, oh, people get abrasions and their fingers hurt and, you know, that there's a risk of bruises. I mean, the regulation says legitimate safety requirement based on actual risk. I mean, it seems like you're suggesting that you have to like be at risk of death for it to be a legitimate safety requirement. I apologize for the confusion. I was not intending to say that. Okay, the only legitimate risk of serious bodily injury. I don't know what it is. I mean, what are you saying? So what I'm saying is that the manufacturer who's implementing these eligibility criteria and is doing these analyses must have a legitimate reason regarding any restrictions they seek to impose. In this case, they didn't do any analyses regarding individuals with limb differences and simply imposed this restriction based off of the speculation of Andreas Tjanser and his reliance on his years of experience and the history of the industry rather than taking into account the ADA. And individuals with disabilities and different risks that they may be. Let me ask you this. There seems to be at least a suggestion or perhaps more than that in your briefing that there should be some sort of individualized assessment that perhaps one patron who has one arm may not, it might not be the best thing for them to ride this ride. But for Mr. Campbell, because he's fit and athletic and he knows he can do that, that he should be permitted to ride the ride. In fact, in the briefing, it says that an individualized assessment of a particular person might be necessary. How would Universal do that and also balance the safety of all of its patrons? How are they supposed to determine Mr. Campbell might be fit so he might be able to do it? But the next person who walks up who only has one arm for a two-handle ride is not. I believe what we were trying to get at in that argument is that ASTM and industry guidelines do put a degree of responsibility on the rider themselves to know what they are capable of. This comes down to the same kind of requirements that they have for individual disabilities, such as people with seizure disorders and back problems where when they get to the front of the ride, they see a sign which depicts whether or not it's a risk to them and they make the individual determination on whether or not they can properly maintain their position or properly ride the ride without posing a risk to themselves or others. Those two examples you just gave are not visible issues. The employee who's running the ride would not be able to determine if somebody has a seizure disorder or a bad back or perhaps there's also usually a restriction on pregnancy. In the early stages, you cannot tell if someone is pregnant. I understand that the patron has to make the individualized determination in those circumstances, but we don't have that situation here. Yes, Judge Branch. By implementing these eligibility criteria without having a reason, Universal and ProSlide are requiring these operators to make a determination about whether or not an individual can maintain their position by just the assumption on how they look and whether or not they have an arm or a hand, where an individual's ability to hold themselves upright in the ride has no correlation to whether or not they have one of those lines. But you understand that if the employee allows anybody on the ride, even a person that they identify might not be able to maintain the proper position and that person is injured, a lawsuit will follow. And we've had catastrophic injuries, even on water slides. I think there was a young child decapitated at one point because there was a weight problem on the raft. So how does the amusement park balance the safety concerns over its patrons versus the disability issue that you're raising? I think the park could have addressed these by requiring the manufacturer to do an additional test to prove why there is such a restriction. In addition, the employees at the front of the lines are just doing their jobs. They are going to do what they are trained to do, which is exactly as they are supposed to. Didn't Universal push back on the manufacturer and achieved more opportunities for people with disabilities to ride more rides? Yes, Your Honor. And we acknowledge Universal has been put in a very difficult position on all of this. But a mere attempt at ensuring that their policies aren't discriminatory does not amount to them completely having a non-discriminatory policy when they're implementing these eligibility criteria without a basis. What weight should Florida's regulatory safety scheme get here? The Florida regulatory scheme has merely given guidance to these water parks and theme parks to the ASTM, which is generally speaking a comprehensive set of guidelines. But in the case of water parks, they're allowing the manufacturer to have free reign over the policies. Now, Florida law, we're not trying to displace. This is within their powers. But we believe that Florida law and the ADA can be read consistently so long as manufacturers are aware of their obligation of the public accommodations, non-delegable duty to comply with the ADA and prevent discrimination in their parks. Thank you, Ms. DeSalvo. And you've reserved three minutes for rebuttal. Thank you. We'll hear next from Mr. Levine. Good morning, your honors. May it please the court. My name is Brent Levine. I represent the United States as an amicus. This court should reverse the district court's decision because it wrongly held that just because universal policy is required under state law, it must be necessary under the ADA as well. That got it backwards. The district court should have started first with federal law and then looked to state law. Because the district court applied the wrong legal standard here, this court can reverse on very narrow grounds that avoids the concerns that universal has raised about undermining Florida's regulatory scheme here. The district court's decision here is error because it focused too much on state law and held that state law effectively immunizes conduct. And that just cannot be right. Yeah. Let's just, I mean, you don't have a lot of time. So, I mean, let's just assume that we don't reverse narrowly and that we want to get some guidance to the district court and to other courts about how to analyze these claims. What would be the right weight to give to a state law requirement like this? So, you've got a state law requirement that's backed up by the sort of professional association, right, that both, that's kind of what you got. How would a district court weigh that? Well, the district court should look at a bunch of factors here. The first, looking to the text of the regulation, which everyone agrees applies here, that says, is the exclusionary policy based on stereotypes, speculation, or generalizations? That's one factor there. You know, just because somebody who's a paraplegic has an accident, a tragic accident at one park at a different ride, doesn't mean that all parks should all of a sudden prevent them from riding the rides. That may lead in to the overprotective rules and policies that Congress cited in the ADA when it defined discrimination. Can I ask you a question about that sort of relatedly, I guess? It seems to me that the issue here isn't whether or not Florida requires the companies like Universal to comply with the manufacturer's safety requirements. It's more a question of whether the manufacturer's safety requirements are based on actual risks as opposed to speculation, generalization, etc. Would you agree with that? Correct. So, the question that the district court maybe should have answered instead was, is the manufacturer's recommendation here based on actual risks or is it instead based on speculation and generalization? Would you agree with that? I agree, yes. Okay. And since that's not answered, the idea would then be to send it back to the district court to consider whether the manufacturer's recommendations are based on actual risks or speculation and generalization. And if it's based on actual risks, then that's fine. It's a necessity, right? Right. But if it's not based on actual risks and instead it's based on generalizations and speculation, then there's a preemption problem. Correct. Okay. I think I understand the position. So, actual risk. I had a little bit of a colloquy with your colleague about actual risk. What is an actual risk? An actual risk of what? And then what would we need to show to show an actual risk? An actual risk of harm. And the regulation is not that demanding. It doesn't require studies, as you said. Sometimes it is going to be obvious. You're not going to need an engineering study to show that there is a risk of harm. Sometimes it may not be obvious, and that's why the district court needs to conduct an analysis here. It may be that you really do need to hold on with two handles, or it may be that most people riding this ride are having their phones up or having their hands in the air and not getting injured. The district court needs to look at this. And Judge Brasher, to answer your question too about other factors, is there a quantifiable risk of harm to somebody with a disability as opposed to somebody without a disability? Does the proposed restriction cover more conduct than necessary? Is it too overbroad? Do the restrictions, are they supported by scientific evidence? It's not required, but certainly that can be considered. And also a factor to look at is does the defendant's own conduct show that the restrictions may not be necessary? I mean, here, this can hardly be a surprise to Universal, this lawsuit, because before the ride even opened up, Universal pushed back and was proposing allowing people with one limb to ride. Universal likely wouldn't have done that if it weren't safe. So that's a factor the district court should consider too. What weight should state law carry, which is sort of the crux of your argument, when here the alternative would be that Universal would be put in a position of noncompliance with state law? What is Universal supposed to do? Universal is supposed to follow federal law. And if federal law mandates certain conduct, then Universal can't be violating state law. That state law in that situation would yield. And we understand, again, too, that Universal may be in a difficult spot here, but Congress specifically placed the burden on public accommodations to comply with the ADA. The buck stops with them. So this case may be unusual in that Universal didn't originate this policy, that it started with ProSlide. But Congress and the ADA put the burden on Universal to either justify this policy or rescind it. And state law should certainly be considered. And Universal has cited cases in their brief where state law was more directly on point, where state law had wildlife regulations, where state law prevented people from driving golf carts in the streets. And courts in those cases took a hard look at those laws and says, is there actual safety evidence to back that state law up? Here, the state law isn't directly on point. And I don't want to say that state law should have more weight or less weight than other factors. I think each case is going to be fact specific, and the district court needs to take a close look at the facts. Let me ask you another sort of angle on this. So you've got state law saying you have to do what the manufacturer says. Usually, I'm not actually sure what this record here, but usually the manufacturer, when they sell you something like this, you agree with them. We're only going to do what you say. You know, we're not going to use it because manufacturers wouldn't be liable. If Universal was able to say, look, we wouldn't be able to offer this ride if we had to create this exception because the manufacturer is only going to sell us this slide and allow us to use their slide if we follow what they say, you know, the policy that we have to do for the safety of the slide. Would that be necessary? But what about if there's no risk of harm? So then it would just be no one gets to own the slide, I guess, is my point, because the manufacturer says we're not going to sell it to you if you can't be consistent with our safety requirements. I think that's another dispute that they'd have to work out. I mean, to answer the underlying concern there that Universal raises, I do want to say we agree that the necessary clause can apply outside the safety context. But in this case, we do have a safety regulation on point, and that regulation must be applied here. So even if it may be necessary under one provision of the law, because the ADA is a comprehensive remedial statute, if there's a regulation on point that shows potential discrimination, then the Universal must comply with that regulation. So you're not, just so I understand your answer, you're not against the conceptual idea that a public accommodation could say, look, the only way we're able to offer this is if we, you know, preclude someone with one arm from participating in it, as an argument that it's necessary to preclude someone with one arm from participating in it. The general idea would be one that someone could make that argument. Sure, as a general idea, somebody could make that argument, again, with the caveat that it's not based on stereotypes or something. Yeah, and it wouldn't be based on safety necessarily, it would just be based on, you know, our contract with whatever only allows us to offer this if we do X, Y, Z, and that's just, that's the only way we can offer it. As a general matter, yes, the necessary clause is not limited to safety, but if there is a safety consideration, then the regulation would apply. But what if, what if it turned out that the manufacturer's recommendation was based on discrimination? I mean, then, then would your position be, I mean, would your position be the same, that Universal could then decide it's going to offer this ride anyway, even though, and that it was based on necessity, even though the manufacturer's recommendation was based solely on discriminatory generalizations and not actual risks? I think if you're, you're starting from... Or any reason, just based solely on discrimination. If there's discrimination that the ADA prohibits, then it's, it's hard for the, it would be hard for a public accommodation to show that that discrimination is permissible. I mean, outside the... Even though they're not going to be able to offer the ride if they, if they take it, right? Well, it, it, each fact, each case is going to be fact dependent. I would say outside the safety context, the analysis is akin to a fundamental alteration. So if this public accommodation could show that, you know, the discrimination would require a fundamental alteration, and discrimination being differential treatment, maybe, Your Honor, I mean that... Discrimination that isn't, quote, necessary, unquote. And the whole reason that the manufacturer, in my hypothetical, is telling the amusement park owner that they can't have people who don't, you know, who are missing a limb or an arm or something is because they don't want to have people who are missing an arm, as opposed to because there's a safety concern. I realize this is a weird hypothetical that probably isn't going to happen, but still, I just, in order to get down to the core of the issue here, I mean, it seems like, how can that be necessary? The mere fact that the amusement park owner cannot offer that ride unless it agrees to discriminate, how can that make this, how can that make it necessary? I mean, it defeats the entire purpose of the ADA. I agree. In a situation like that, it would not be necessary if there's true discrimination there. And, you know, then you get into other questions. Is it really necessary? You know, is there a way for Universal to seek court action to amend that, whatever the contractual obligation is? There may be other ways to show that it's not necessary to discriminate in that case. I mean, the examples that I'm giving are completely outside the safety context. For example, courts have talked about high school age limits, you know, where you can be discriminating against people with disabilities who needed more time to complete school. And there's a clear line being drawn excluding people from disabilities, but not based on discrimination. In a case like that, I think the plaintiff in that case would have an easier time showing that it's not truly necessary when it's based purely on discrimination. Well, let me ask you something. Would they have an easier time, or would it not be necessary, right? I mean, like, I guess I'm having a little confusion over your argument as to, it seems like if it's okay, because there's a contractual provision, too, in the ADA. It says you can't contract away, I mean, you can't contract away discrimination on the basis of discrimination, right? I mean, you can't contract that away. So, I don't understand why the answer isn't simply, no, they couldn't do that. It wouldn't qualify as necessary. I think you're right. It would not qualify as necessary in that hypothetical that you're giving now. I was speaking more generally, but in a situation like that, I agree it would not be necessary. Well, I was just going to ask, one question I have is how the burden would apply here. So, some district courts, for example, have said the way the burden shifts in this context is basically the plaintiff shows that they're discriminated against, and then the public accommodation has to show that the discrimination is necessary. Does the Department, do you take any position on that, the way the burden should apply? We agree with that. The plaintiff does have the initial burden. The necessary is an affirmative defense. The Supreme Court addressed this in Title I of the ADA in the Chevron versus Ezekiel Ball case, and Title I has very similar language about criteria that tends to screen out, and the Supreme Court said there that the necessary prong is an affirmative defense. So, that's what we would say applies in Title III as well. Let me ask you about necessary. One of Universal's arguments is that one reason that Florida's safety scheme is necessary is because uniformity is necessary. You can't have park employees trying to determine this person with one arm can ride it, this person with one arm cannot. Is uniformity a valid interest to consider when determining if a safety requirement is necessary under the ADA? Absolutely. I think uniformity is an interest that the district court should consider here. This case is unique in that there's no particular risk to this particular policy, but saying that one application of an administrative scheme doesn't pass muster, that doesn't necessarily harm uniformity here. That, in fact, may promote it by giving the message that the ride operators need to comply with the ADA. All right. Thank you very much, Mr. LeBlanc. Thank you, Your Honor. Okay. We'll hear next from Mr. Raisman. Thank you, Your Honor. If it pleases the court, David Raisman for appellee and defendant below Universal Development Limited Partners. Seated at council table is Michael Boone, being the co-counsel. Most of the colloquy to date has been focused, to this point in the argument, has been focused on one of Universal's three necessary arguments for why it's necessary. And thank you, Judge Branch, for raising one of them, the uniformity issue as well. I want to focus for a second on not just passing over the first one. It's necessary because the state law requires it for a couple of reasons. One, at page 19 of our brief, we cite several cases that the Department of Justice has now referred to where, in fact, the existence of state or local law in the traditional exercise of those states' police powers over health and welfare issues made it necessary. The Brickers case is a decision of the Sixth Circuit, admittedly under Title II of the ADA, but it actually held and pointed out that it would put an entity in a Hobson's choice as to whether it would violate the state or local law again in exercise of the traditional police powers or instead abide by the federal law. But that happens with every preemption issue, right? I mean, the state of Alabama still has, I think, you can correct me if I'm wrong, but I think we still have a provision in the Constitution that says schools have to be separated by race, right? That's in Alabama. It's like a fundamental charter. We don't do that anymore because federal law says we can't do that, right? So, I mean, that's what I – I mean, who cares? I understand it's not automatic, Judge Brasher, but what's different here is that when Congress passed not just the ADA, but this particular provision, the eligibility criteria provision, it did so with explicit recognition not just of safety standards, but of a very specific safety standard that mentions the height requirements, both in the legislative history and in the Department of Justice's regulation. This is a directly analogous requirement. But it doesn't – I mean, it seems to me like if those regulations were discriminatory and not based on actual risk, then they themselves – if the state's adopting them as their own, then the state is adopting a discriminatory standard, and the ADA itself has a provision that expressly says that it doesn't preempt state laws that provide more protection, which to me pretty clearly is saying that it does preempt state laws that provide less protection. You know, the federal standard is the floor. You can have more if you're a state, but you can't have less. And so I don't – I just – I mean, I understand that it makes things difficult for universal. It certainly does, and that's unfortunate. But I don't see how that is in and of itself a defense here. Your Honor, this court has specifically ruled when the congressional purpose is the touchstone here, and the congressional purpose clearly reflects the notion that we're going to look at whether it's necessary and specifically anticipates the very kind of regulation that was happening here, height requirements. Those height requirements derive from the exact same source. They're neutral criteria from the exact same source in the operations manual. They didn't say operations manual in the legislative history in the regulation. But I knew it was coming. But that's what I don't understand. So, I mean, I get your – I get some of your argument, but I don't get this argument about state law. It seems unnecessary of you to make. The height requirements either rise or fall based on whether the height requirements are necessary for the ride, right? Well, I think Congress said essentially – I mean, so if a state just passed a law that said all rides, you know, if you're shorter than 6'5", you can't ride any rides in Florida, that's just necessary. Is that where your position would be? No, Your Honor. Like the teacups at Disney World, you know? I'd be thankful for that. But, I mean, that's why I don't get it. I just don't get it. Don't we have to look at the actual thing that's happening and not just whether the state of Florida said it was law or not? I'm going to move on to our other necessary arguments in a second. But before I do, I'll just say this much. The Department of Justice regulation explicitly recognized these kinds of rider restrictions as necessary. Done. It's already been acknowledged and probably – But that's the point. I don't think you need to make this argument that you're making. You seem to be arguing that they're always necessary just because they're rider restrictions, just because. That's where this doesn't make much sense to me. Why are you making that argument? Well, let me move to the second argument that we – the second uniformly, which is different than the one Judge Branch pointed out. And that's what appellants concede here, and everyone seems to concede, is that the manufacturers have the superior expertise in order to make these determinations. Here's the question that I have about that. I have no problem with manufacturers using their expertise to make these kinds of decisions as long as they're based on actual risks. That's what the statute says, the regulation says. It has to be based on actual risks. And the question is – and maybe it's there. I'm not sure I saw it. And it would make sense maybe why it wouldn't be there because the district court didn't decide on this basis. But I did not see where the evidence is in the record that it's based on actual risks. And maybe you can point me to what you think is the evidence in the record that shows that it's based on actual risks. And then maybe the answer is it needs to be sent back to the district court to do that. Or maybe the answer is we can affirm on any basis. And if that's in the record, we can affirm on that basis. But I think that's the question for me anyway right now. Universal picks B, by the way, Your Honor. Affirm on a different basis if the court feels it must. But we heard appellants – Well, if it's in the record. In this morning's record, appellant admitted that the manufacturer identified specific risks and engaged some colloquy with Judge Brasher about how significant those risks were and what kind of injuries. So there was a recognition of risk. And I'm going to point you to other things in the record, which, again, the court below did not recognize because it limited its decision to that first necessary factor. In document number 39-1 in the record, at paragraphs 11, 12, and 17, we have the manufacturer describes its process of formulizing its ride requirements after it analyzes data from, it says, thousands of ride modifications that create a pool of empirical data from which it draws. The manufacturer also engages in experimentation, theoretical physics calculations, gradients, acceleration, velocity, gravity, speed maps, et cetera. The manufacturer employs mechanical engineers and other kinds of engineers. In this case, the manufacturer hired an outside consultant, Rams. That's also in the record there. And it's in the stipulation as well. And here, as was previously pointed out, Universal asked them to look at it again, which gave them yet another opportunity to scrutinize the need for this. It seemed like you haven't argued in the district court that it would be unsafe for a person without an arm to ride. Did you argue that it would be unsafe? We did, Your Honor. We argued that it was unsafe to depart from the manufacturer's recommendations. So the manufacturer, again, superior qualifications to consider all these things, amusement park operators don't have that capacity. And let's be clear about what the requirement at issue is. I mean, you're sort of parsing things a little bit, right? We're cutting this alignment kind of thin here. Either you're arguing that it's unsafe for a person with one arm to ride, no matter what it's based on, or you're arguing that the manufacturer said it was unsafe to ride. We're arguing that the manufacturer's determinations, which are based on the acknowledged superior qualifications, consistent with the regulatory scheme of the state of Florida, determines what's safe and not safe. And let's be honest, there's market factors operating here, as has been pointed out. If they're going to create all kinds of ride restrictions that keep our guests off the rides, we don't want it. We're not going to work with that manufacturer. So we want to open up the rides. I understand. And I, again, if it's unsafe, I agree. It's necessary. I'm just wondering, this is purely a record kind of question and an argument kind of question. What is it specifically you're arguing? Are you arguing it's unsafe? And if you're arguing it's unsafe, where's the evidence of the actual risks, which is what you were talking about? You were referring to calculations. I'm an apologist, but maybe you can help me to understand how those calculations show that it's unsafe for a person with one arm. Maybe it helps to go back to the requirement here, because we're acting as if it's somehow something out of outer space to have a holding on to an amusement park ride, as if no manufacturer, let alone this one with 35 years of experience, has ever applied and considered the helpfulness of holding on to a ride while maintaining proper rider position. That's not a novel concept. It didn't start when they designed these rides. I was just, I think it's called the Metro Mover. Apologize if I'm out of town. The Metro Mover had the automated announcement as I was coming here to the courthouse to make sure to hold on, you know, hold on to the bars or handle. I forgot exactly what it was. Yeah, but I bet you anything that the Metro Mover isn't turning away people with one arm. That's correct, Your Honor. And it has different dynamic forces than the rides that are involved here. I understand. And that's exactly what I'm asking you. I'm not, I want to be clear. I'm not arguing that somebody who would be unsafe on the ride should be allowed to go on. I agree with you. They should not. I think that's clearly what the ADA provides for. All I'm asking about is whether it's your position, two things. Whether you are arguing that it is unsafe for someone with one arm to go on. And two, what evidence specifically are you pointing to to show that? That's what I'm asking. Where in the record is it? Because as you know, the district court didn't decide on this basis. So if you want us to decide on this basis, we need to look at where it is in the record so we can say, well, we can affirm on any basis and this is in the record and we're affirming on this basis. Or if it's not in the record, then we have to send it back to the district court and say, district court, you need to look at this. You see what I'm saying? Yes, Your Honor. I believe it's on this morning's record, as I said earlier. And in document 39-1, and among other places, paragraphs 11, 12, and 17. But really throughout that affidavit, the manufacturer's director of research, design, and standards. It's also proven by the hiring of an outside consultant to determine that. And it's also by the fact that Universal made inquiries. Is this necessary? Do we need to do this? All of those factors were considered in establishing a very routine rider requirement, as routine as height limitations, I would propose, that the Department of Justice recognized as necessary. Let's also be clear that even going beyond any individualized assessments that Judge Brasher was talking about earlier, any requirement, wherever you set the standard, and this is true of every ADA accessibility standard that exists, take the most basic one, slope. You're going to set it at a place that's going to permit access to some persons with disabilities and block access for others. So height limitations are another example. Again, recognized by the Department of Justice. You're setting a height limitation. There are certainly some individuals of short stature who could do this. But when you have hundreds of thousands of people visiting amusement park, a amusement park, let alone all of the parks in the state of Florida or in the country, there is a need for uniformity. And there is going to be denial from some individuals who would safely be able to ride the ride. It's inevitable. And I would put to you that that's exactly what the state of Florida recognized when it came up with this scheme, that there's no manageable way to actually do this differently. We need uniformity. We need to rely on what everyone acknowledges here is a superior qualification of the manufacturer to make those determinations. And that's what's been done. ASTM, which is also incorporated into Florida law, actually requires in places the consideration of disability access issues. And, again, ASTM, if the court's not familiar, and this is in the declaration of Brian King, our expert, which is stock number 31 at paragraph 13 and 14, he talks about the ASTM process, which actually involves equal membership of stakeholders, including users. The use of these standard-making bodies to adopt standards and guidelines for all kinds of industries is very common. It was recognized, as amicus IAPA pointed out in their brief, in the Allied Tube decision in the Supreme Court. And, frankly, the Justice Department, even in its access regulations, its disabled access regulations, to be clear, incorporates ASTM standards, admittedly on playground equipment. It also incorporates the standards of four other standards-making bodies, just wholesale, saying we adopt these into our access standards. And it's not new. The other place it's done so, prominently in Robles v. Domino's Pizza, but repeatedly in cases all over the country. I don't think anybody's disagreeing that the state can require you to file ASTM requirements, so long as they don't violate the ADA. I mean, I don't think anybody's second-guessing that, unless you're arguing that you should be able to file them, even if they violate the ADA, in which case, I mean, feel free to continue, but I'm not sure. Let me jump to it. I'll describe it as a parade of horribles. If we were going to adopt a standard where you had to actually justify to any individual rider, like Mr. Campbell, and there's hundreds of thousands of them, and you could infer tens of thousands with disabilities at various parks, and each of those had the ability to challenge a necessary determination, as it's made through this elaborate and, we think, well-thought-out system, for how it should work. But then, just to be clear, your argument isn't that amusement park owners should be able to violate the ADA. It's that the necessary requirement is not individualized, right? I mean, isn't that your argument? It can't be. The height limitations that are expressly blessed are not individualized. You're going to set that in an arbitrary place, like a slope requirement, that's going to permit access to some people with disabilities, in that case, short stature, and deny it to others. So, we can't make individualized determinations based on a person-by-person basis. I don't hear a lot of support on the panel for that rule, that it has to be individualized. But the concern that I have is that it seems like you're arguing that just whatever requirements come out of this process that this trade organization is going to go through are inherently necessary. Is that kind of what you're saying? To be clear, the manufacturer following the trade organization's rules, yes, they should be necessary because there is a need for uniformity and there's going to be recognized exclusions wherever it's set. So, that argument seems strange to me. Why would whatever this manufacturing trade organization, safety organization, why would whatever they came up with, courts just like bless them and say, well, that must be necessary under the ADA without any explanation whatsoever? So, instead, we would put the obligation on operators without all those qualifications. We're dealing with lots of different kinds of operators. But you just have to defend the policy, right? There's a necessity in relying on the superior qualifications of the manufacturer and there's necessity in having uniformity with the recognition that that uniformity could be problematic. Again, I think you're seeing at the panel, we're not pushing back on uniformity. What we're continuing to push back on is if the manufacturer comes to Universal and says, I want to sell you a ride and no one who's missing any limb can ride any ride that I'm going to sell you. And Universal says, well, we really want to see if we can get some people who might be missing a limb on some of these rides. And Universal asks the manufacturer, so tell us what went into your analysis. And they say, we didn't do any analysis. That's too hard. It's just easier if we say no one who's missing a limb. You're not suggesting that that would pass muster under the ADA, are you? Absolutely not. And it would not pass muster under Florida law because ASTM requires rigorous scientific testing of all these requirements. So here you are, in fact, even though the plaintiff is questioning and saying that the manufacturer has not done the requisite analysis to determine that these restrictions on riders are necessary, you are defending the manufacturer's process, saying they are the experts and they did the necessary analysis. They did the necessary tests. They might not have done it in this case, but because they are engineers and know what this is about, we're comfortable with that, that that satisfies state law and the ADA. I agree with everything Your Honor just said, except respectfully. I think they did do it in this case and they did it with respect to this requirement. Okay. Okay. Where is that in the record exactly? I mean, so you've got your expert. I read some deposition testimony from, I think, someone at the manufacturer that didn't seem like they did a lot. I mean, where is it in the record? It's at the Tanzer affidavit. That's the manufacturer's director of research, design, and standards. That's document 39-1 at paragraphs 11 through 14 and 16 through 18. Probably other places there in the stipulation, there's a recognition that they hired the outside consultant. It's also stipulated that Universal had months of this document. They hired the outside consultant, I guess, but what did the outside consultant do, right? I mean, it did hazard analyses. Okay. And what did that analysis show? That's not in the record. Okay. Well, I guess that's my point. Like the hiring of someone to do an analysis, that we rely on these standards created by someone else. I'm trying to find where I can, you know, where it's like a risk assessment in the record that says like, hey, if you're not holding both handles, this is the risk that's going to happen to you. The manufacturer didn't come to this ride with a vacuum of its understanding of dynamic forces and how to try to maintain proper ride position to avoid risk. And the benefits, in some cases, depending on those forces, of holding on. What about something the government said, which is maybe we should consider whether people actually hold both handles when they go on the ride? You know, Universal does everything it can to do it. And the reason it does is people do get injured and people do report injuries. Now, can we directly tie them to causation? It doesn't maintain the standard to make its riders unhappy. It maintains these standards because people get hurt, they bring claims, they sue. And there's a need for this kind of regulation. There's a need for making it uniform from a single place. Keep in mind that the same rides are in different parts. If you have a bunch of different operators individually making decisions about who can ride this particular ride at Universal versus another water park, you're going to have a variety of determinations. And courts, different courts, reviewing those same standards in an area that I would again put to the court that was specifically recognized. I'm sorry to interrupt, but I think we have this part of your argument. Thank you so much, Mr. Raisman. All right. Let's hear back from Ms. DeSalvo. You have three minutes for rebuttal. There are four things that I would like to address. First, I was misquoted. I did acknowledge the expertise of the manufacturers and that they are in the best place to make these determinations of different particularized risks. But in the record filed under DE44, Exhibit D does show their risk analyses, and they have nothing specifically addressing limb differences. In fact, in the deposition of Universal's expert Brian King, he had stated that if the manufacturer had set forth a rule in which blind individuals were unable to ride the ride, he would have to follow it, regardless of how ridiculous it sounds. Second, height requirements are not the same as a limb difference. A height requirement screens out a large number of people and does not focus solely on individuals with disabilities. In addition, the height requirements are blessed by the ASTM, while Congress has acknowledged them. They are also extensively tested and not just based off of fear of liability. I mean, but fear of liability is a fair and reasonable consideration, is it not? Under the ADA, fear is not a sufficient reason to implement baseless and arbitrary eligibility criteria. Assuming that it's based on actual risks. Yes, so if there was an actual risk, the fear is warranted. However, in this case, they had nothing in their record to prove that there was an actual risk. I would also like to address the absolute defense of, you know, it's necessary because of state law requiring it. Bench, the case bench versus Six Flags Over Texas addressed this aspect of it when they correctly held the public accommodation liable for manufacturers discriminatory guidelines and saying that if compliance with state law is a concern, then they have the manufacturer, not the manufacturer, the public accommodation has the requirement to start a suit with the state in order to be released from the obligation to follow those discriminatory policies. And finally, these are not creating uniform guidelines by just simply following a manufacturer. Every state has different laws which have different requirements. And by allowing any foreign manufacturer to come in and create state law by proxy, we are not creating a uniform set of guidelines. Thank you. Thank you very much. And I see that you and I know you told us that you are arguing as a student and we appreciate your having done so in supervision by Mr. Dietz. And we appreciate the argument by all counsel today. Thank you.